**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ABHEY PARMAR, derivatively on behalf of MICROSTRATEGY INCORPORATED d/b/a/ STRATEGY, | |
| Plaintiff, | Case No.: 1:25-cv-1040 |
| vs. | |
| MICHAEL J. SAYLOR, PHONG LE, STEPHEN X. GRAHAM, ANDREW KANG, JARROD M. PATTEN, LESLIE J. RECHAN, and CARL J. RICKERTSEN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MICROSTRATEGY INCORPORATED d/b/a STRATEGY, | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Abhey Parmar ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant MicroStrategy Incorporated ("Strategy" or the "Company"), files this Verified Shareholder Derivative Complaint against Michael J. Saylor ("Saylor"), Phong Le ("Le"), Stephen X. Graham ("Graham"), Andrew Kang ("Kang"), Jarrod M. Patten ("Patten"), Leslie J. Rechan ("Rechan"), and Carl J. Rickertsen ("Rickertsen") (collectively, the "Individual Defendants" and together with Strategy, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Strategy, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Saylor, Kang, and Le for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for

1

Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Strategy, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Strategy's current and/or former officers and directors from April 30, 2024 to April 4, 2025, both dates inclusive (the "Relevant Period").

2.      Strategy operates as a Bitcoin Treasury Company, utilizing cryptocurrency as its primary reserve asset. Cryptocurrencies are digital assets which utilize cryptography to conduct secure financial transactions. Cryptocurrencies operate on a decentralized and distributed ledger technology known as a "blockchain." Bitcoin in particular uses an open-source protocol and is collectively maintained through a peer-to-peer network of decentralized user nodes. In addition to the normal functions of a treasury company such as providing equity and debt financings, among other things, the Company uses portions of its proceeds to continually grow its Bitcoin reserve. The Company offers an array of securities for consumers and investors, including but not limited to fixed income instruments and equity as noted above.

3.      During 2023, Strategy acquired a total of roughly 56,650 bitcoins at an aggregate purchase price of roughly $1.902 billion and at an average purchase price per bitcoin of $33,580

per bitcoin. During 2024, Strategy acquired a total of roughly 258,320 bitcoins, at an average purchase price of roughly $22.07 billion and at an average purchase price per bitcoin of $85,447. During the period of January 1, 2025 to February 14, 2025, Strategy acquired roughly 31,270 bitcoins, at an average purchase price of roughly $3.165 billion for an average purchase price per bitcoin of roughly $101,225 per bitcoin. The Company did not sell any bitcoin during 2023, 2024, or the period between January 1, 2025 to February 14, 2025. Further, the Company has no specified target or goal for the quantity of the bitcoin it holds. Notably, the Company uses an "industry-leading AI-powered enterprise analytics software" intended to further enhance its digital asset and enterprise analytics sectors.[1]

4.     During the Relevant Period, the Company repeatedly emphasized the importance of bitcoin to its strategies and operations. Indicative of this fact was the Company's addition of new key performance indicators ("KPIs"), including but limited to bitcoin yield ("BTC Yield"), bitcoin gain ("BTC Gain"), and bitcoin monetary gain ("BTC $ Gain").

5.     On January 1, 2025, the Company enacted the proposal from the Financial Accounting Standards Board's ("FASB")[2] Accounting Standards Update No. 2023-08, titled *Intangibles —Goodwill and Other —Crypto Assets (Subtopic 350-60): Accounting for and Disclosure of Crypto Assets* ("ASU 2023-08").

6.     Although Defendants reported during the Relevant Period that the adoption of ASU 2023-08 would likely have a material impact on the Company's financial records, Defendants

---

[1] The term "A.I." refers to artificial intelligence.

[2] The FASB operates as a private-sector, not-for-profit, and independent body whose primary responsibility is establishing accounting standards and guidelines for both non-profit organizations and publicly traded companies. Among the FASB's chief duties is to create and maintain generally accepted accounting principles ("GAAP") in the United States. The FASB makes frequent revisions to the GAAP standards, and the SEC requires publicly traded companies to comply with GAAP standards in their periodic financial reports and filings.

failed to accurately disclose the full extent to which the Company's financial records would be impacted. In particular, Defendants failed to disclose the substantial losses Strategy could potentially realize through the use of the fair value accounting methodology set forth under ASU 2023-08. Throughout the Relevant Period, Defendants would continue to tout the Company's financial prospects and success with regard to its bitcoin-driven strategies and operations, while continuing to minimize the potential effects of adopting ASU 2023-08.

7.      The truth fully emerged on April 7, 2025, during pre-market hours, when the Company filed a Current Report on Form 5-K with the SEC to disclose that the Company had recognized a $5.91 billion unrealized loss on its digital assets in the first quarter of 2025.

8.      On this news, the Company's stock price fell $25.47 per share, or 8.67%, from a closing price of $293.61 per share on April 4, 2025 to close at $268.14 per share on April 7, 2025.

9.      Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the adoption of the Financial Accounting Board's Accounting Standards Update No. 2023-08 was riskier and more impactful to the Company's finances than represented; (2) the risks associated with bitcoin's volatility were greater than represented; and (3) as a result the Company's profitability when applying its bitcoin-driven investment strategy and treasury options were substantially less profitable than represented. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct

and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

11.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

12.     Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of the stock was artificially inflated, obtaining proceeds of *roughly $31,460,747.*

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Founder and Chairman of the Board/Executive Chairman, its President and Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO") to a securities class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Saylor's, Kang's, and Le's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the

Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Strategy. Plaintiff has continuously held Strategy common stock at all relevant times.

### Nominal Defendant Strategy

21.     Strategy is a Delaware corporation with principal executive offices at 1850 Towers Crescent Plaza, Tysons Corner, Virginia 22182. Strategy's common stock trades on The Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MSTR."

**Defendant Saylor**

22.      Defendant Saylor is the Company's founder and has served as Chairman of the Board and Executive Chairman since August 2022 and previously served as Chairman of the Board and CEO from November 1989, when he founded Strategy, to August 2022. He also previously served as President from November 1989 to November 2000, from January 2005 to October 2012, and from January 2016 to July 2020.

23.      The Schedule 14A the Company filed with the SEC on April 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Saylor:

> Mr. Saylor has served as Chairman of the Board and Executive Chairman since August 2022 and previously served as Chairman of the Board and Chief Executive Officer from November 1989, when he founded Strategy, to August 2022. Mr. Saylor also previously served as President from November 1989 to November 2000, from January 2005 to October 2012, and from January 2016 to July 2020. Prior to that, Mr. Saylor was employed by E.I. du Pont de Nemours & Company as a venture manager from 1988 to 1989 and by Federal Group, Inc. as a consultant from 1987 to 1988. Mr. Saylor received an S.B. in Aeronautics and Astronautics and an S.B. in Science, Technology, and Society from the Massachusetts Institute of Technology.
>
> **Qualifications**: We believe that Mr. Saylor is well-suited to serve on our Board due to his position as our Executive Chairman and his more than 30 years with the Company, including as its founder. In addition to his leadership expertise, Mr. Saylor is regarded as a technology visionary and bitcoin thought leader, and he has deep knowledge of the Company's history, strategy, technology, and culture, as well as unique insight into the Company's product development, marketing, finance, and operations.

**Defendant Le**

24.      Defendant Le has served as a Company director and as President and CEO since August 2022 and previously served as President from May 2022 to August 2022, President & CFO from July 2020 to May 2022, Senior Executive Vice President, Chief Operating Officer & CFO from April 2020 to July 2020, Senior Executive Vice President & Chief Operating Officer from November 2019 to April 2020, Senior Executive Vice President, Chief Operating Officer, CFO &

Treasurer from June 2018 to November 2019, and Senior Executive Vice President, CFO & Treasurer from August 2015 to June 2018.

25.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Le made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|---------------------|----------|
| June 17, 2024 | 590 | $1,441.81 | $850,668 |
| March 24, 2025 | 3,281 | $329.38 | $1,080,696 |

Thus, in total, before the fraud was exposed, he sold 3,871 shares of Company common stock on inside information, for which he received approximately $1,931,364 in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.    The 2025 Proxy Statement stated the following about Defendant Le:

Mr. Le has served as a member of the Board and as President & Chief Executive Officer since August 2022 and previously served as President from May 2022 to August 2022, President & Chief Financial Officer from July 2020 to May 2022, Senior Executive Vice President, Chief Operating Officer & Chief Financial Officer from April 2020 to July 2020, Senior Executive Vice President & Chief Operating Officer from November 2019 to April 2020, Senior Executive Vice President, Chief Operating Officer, Chief Financial Officer & Treasurer from June 2018 to November 2019, and Senior Executive Vice President, Chief Financial Officer & Treasurer from August 2015 to June 2018. Prior to joining Strategy, Mr. Le served as the chief financial officer of XO Communications, a privately-held telecommunications company, from August 2014 to August 2015. From March 2010 to August 2014, Mr. Le held senior positions at NII Holdings, a Nasdaq-listed telecommunications company, including vice president of financial planning and analysis, vice president of strategy and business operations, and vice president of strategic finance. Prior to that, Mr. Le worked in the consulting practice at Deloitte from 1998 to 2010, where he held various positions, including senior manager. Mr. Le holds a B.S. in Biomedical and Chemical Engineering from The Johns Hopkins

University and an M.B.A. from the Sloan School of Management at the Massachusetts Institute of Technology.

**Qualifications**: We believe that Mr. Le is well-suited to serve on our Board due to his position as our Chief Executive Officer, his more than nine years with the Company, and his outside executive experience.

**Defendant Kang**

27.     Defendant Kang has served as the Company's Executive Vice President and CFO since May 2022.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kang made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 17, 2024 | 209 | $1,441.81 | $301,338 |
| March 24, 2025 | 2,185 | $329.38 | $719,695 |

Thus, in total, before the fraud was exposed, he sold 2,394 shares of Company common stock on inside information, for which he received approximately $1,021,033 in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29.     The 2025 Proxy Statement stated the following about Defendant Kang:

Andrew Kang has served as Executive Vice President & Chief Financial Officer since May 2022. Mr. Kang has over 20 years of experience in accounting, treasury, capital markets, asset liability management, financial planning and analysis, and investor relations. Prior to joining Strategy, Mr. Kang served as Executive Vice President and Chief Financial Officer of Greensky, Inc. ("Greensky"), a publicly listed financial technology firm specializing in point-of-sale consumer financing, from September 2020 until it was acquired by Goldman Sachs in April 2022. Prior to Greensky, Mr. Kang served as Corporate Treasurer for Santander Holdings USA, the U.S. subsidiary of Banco Santander S.A., from April 2018 to September 2020,

where he oversaw liquidity, balance sheet and capital management for the $150 billion bank holding company. Mr. Kang has also served as Corporate Treasurer at Santander Consumer USA and Exeter Finance, and has held leadership positions at HSBC Holdings plc and Capital One Financial Corporation. Mr. Kang also currently serves on the Board of Trustees at The Schenck School, one of the national's oldest and most highly regarded independent elementary schools for dyslexic students in the U.S. Mr. Kang received a B.A. in Biology and post-baccalaureate certification in Accounting, both from the University of Virginia.

**Defendant Graham**

30.     Defendant Graham has served as a Company director since April 2014 and also serves as the Chair of the Audit Committee and as a member of the Investments Committee.

31.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Graham made the following sale of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 13, 2024 | 30,000 | $381.24 | $11,437,200 |

Thus, in total, before the fraud was exposed, he sold 30,000 shares of Company common stock on inside information, for which he received approximately $11,437,200 in proceeds. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

32.     The 2025 Proxy Statement stated the following about Defendant Graham:

Mr. Graham has been a member of the Board since April 2014. Mr. Graham is currently president of CrossHill Financial Group, Inc., a private merchant bank and advisory firm that he founded in 1988, and was a general partner of both CrossHill Georgetown Capital, L.P. from 2000 through December 2023 and CrossHill Debt II, L.P. from 2004 through December 2023. He has been a manager of CrossHill Georgetown Management, LLC since 2000. Mr. Graham also served as chairman of the board of directors from 2009 until December 2022, and as chief executive officer from 2014 until December 2022, of Meteor Affinity, Inc. ("Meteor"), a marketing and advertising company, which operated the Official NASCAR

Members Club and which served as a portfolio company of CrossHill Debt II, L.P. Meteor was voluntarily dissolved on December 15, 2022. Prior to that, Mr. Graham was a principal with Kidder, Peabody & Co. and held positions with Merrill Lynch & Co. and Arthur Young & Co. (which later became part of Ernst & Young LLP). Mr. Graham was a member of the board of directors of TNS, Inc. ("TNS"), a former New York Stock Exchange-listed global data communications and interoperability solutions company, from 2003 until the company's acquisition by Siris Capital Group, LLC in 2013. While a member of the board of directors of TNS, Inc., Mr. Graham served as chairman of the audit committee from 2003 to 2013 and as chairman of the board of directors from 2012 to 2013. Mr. Graham also served as a member of the board of directors of Speedus Corp. from 2009 to 2011. Mr. Graham also previously served from 1995 to 2001 as a member of the board of directors of Credit Management Solutions, Inc., a former Nasdaq-listed credit processing software company, and several private companies. Mr. Graham received a B.S.B.A. from Georgetown University and an M.B.A. from the University of Chicago Booth School of Business.

**Qualifications**: We believe that Mr. Graham is well suited to serve on our Board due to his substantial executive experience and his experience as an outside director and audit committee member, which provides the Board with important perspectives on financial matters.

### **Defendant Patten**

33.    Defendant Patten has served as a Company director since November 2004 and also

serves as a member of the Audit Committee and as a member of the Compensation Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Patten:

Mr. Patten has been a member of the Board since November 2004. Mr. Patten founded RRG, a global real estate consulting and advisory firm, and has served as the firm's president and chief executive officer since its inception in 1996. RRG is an international consulting firm specializing in the development and implementation of enterprise-wide audit and cost control strategies that heighten operational controls, lower operating costs, increase transparency, and extend cost accountability for RRG's geographically diverse client base. In January 2024, Mr. Patten joined the board of directors of Core Scientific, Inc. ("Core Scientific"), a Nasdaq-listed digital asset mining and blockchain infrastructure company, and has since served as the chairman of the board of directors and as a member of the audit committee of the board of directors of Core Scientific. Mr. Patten received a B.S. in Biology and a B.A. in Biological Anthropology and Anatomy from the Trinity College of Arts and Sciences at Duke University.

**Qualifications**: We believe that Mr. Patten is well-suited to serve on our Board due to his leadership and management expertise as a chief executive officer, his

international business, finance, and corporate compliance experience, and his extensive knowledge of cost and operational controls.

**Defendant Rechan**

35.    Defendant Rechan served as a Company director from March 2018 to June 12, 2025.

36.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rechan made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 7, 2024 | 20,000 | $275.42 | $5,508,400 |
| November 11, 2024 | 20,000 | $325.92 | $6,518,400 |
| March 25, 2025 | 15,000 | $336.29 | $5,044,350 |

Thus, in total, before the fraud was exposed, he sold 55,000 shares of Company common stock on inside information, for which he received approximately $17,071,150 in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.    The Schedule 14A the Company filed with the SEC on April 12, 2024 (the "2024 Proxy Statement") stated the following about Defendant Rechan:

Mr. Rechan has been a member of the Board since March 2018. Mr. Rechan founded Rechan Consulting Group LLC, a CXO services firm, and has served as the firm's chief executive officer since its inception in February 2022. Mr. Rechan has also served as a board advisor since March 2024 at Lorica Cybersecurity, a privately-held developer of privacy enhancing technologies. Mr. Rechan also served as chief growth officer from February 2022 through January 2024 and as a

board advisor from January 2017 through January 2024 at JASCI Software, a privately-held next generation warehouse management system company. Mr. Rechan also served as a board advisor and board member at Cognitive Scale, a trusted AI development platform company, from October 2014 through December 2022. Mr. Rechan served as chief operating officer of PROS Holdings, Inc., a publicly-traded cloud software company, from May 2020 to February 2022. From September 2017 to May 2020, Mr. Rechan served as president and chief executive officer and a director of Solace Corp., a privately-held smart data movement solutions company. Prior to that, Mr. Rechan served as president and chief executive officer and a director of Halogen Software, a cloud-based talent management software provider, from May 2015 to May 2017. Previously, he served as general manager from November 2011 to April 2014 and as vice president, sales, solutions, and services from February 2008 to October 2011 of IBM Business Analytics, a software group at IBM Corp. ("IBM"). He also served as chief operating officer of Cognos Inc. from 2006 to 2008. Prior to Cognos, Mr. Rechan worked at Siebel Systems, Inc. ("Siebel Systems") and then Oracle Corporation ("Oracle") upon its acquisition of Siebel Systems in 2006. From March 2006 to May 2006, Mr. Rechan served as senior vice president and global general manager, CRM strategy at Oracle. From 2004 to 2006, Mr. Rechan served as senior vice president and general manager of Americas sales of Siebel Systems and served in the same capacity for the global manufacturing and distribution industries business unit of Siebel Systems. Mr. Rechan served as senior vice president and general manager of North American worldwide field operations of Cadence Design Systems Inc. from 2003 to 2004. He served as president and chief operating officer of Onyx Software Corp. from 2001 to 2002. Prior to 2001, Mr. Rechan held several leadership positions at IBM across field sales, systems engineering, services, solutions, development, and general management in North America, Europe, and Asia Pacific. From May 2015 to May 2020, Mr. Rechan served on the board of directors and audit committee of PROS Holdings, Inc. Mr. Rechan received a B.S. in Electrical Engineering and a B.A. in Organizational Behavior from Brown University and an M.A. in Management from Northwestern University.

**Qualifications**: We believe that Mr. Rechan is well-suited to serve on our Board due to his expertise in corporate strategy and development in the enterprise software sector and his extensive experience in international operations, sales, and services.

### Defendant Rickertsen

38.    Defendant Rickertsen has served as a Company director since October 2002. He also serves as the Chair of the Compensation Committee and as a member of the Nominating Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Rickertsen:

Mr. Rickertsen has been a member of the Board since October 2002. Mr. Rickertsen is currently managing partner of Pine Creek Partners LLC and Iris Partners LLC, each a private equity investment firm, positions he has held since January 2004. Mr. Rickertsen has also served as a trustee of Apollo Origination II (UL) Capital Trust and Apollo Origination II (Levered) Capital Trust, each of which is a closed-end management investment company, since March 2025, as a member of the board of directors and audit and compensation committees of Magnera Corp. (which spun off from Berry Global Inc.), a manufacturer of non-woven consumer products, since October 2024, and as a member of the board of directors of Hut 8 Corp. (formerly Hut 8 Mining Corp., prior to a business combination transaction completed in November 2023), a Nasdaq-listed digital asset mining company, since December 2021. He previously served as a member of the board of directors and audit and compensation committees of Berry Global Inc., a global manufacturer and marketer of value-added plastic consumer packaging and engineered materials, from January 2013 to October 2024. From January 1998 to January 2004, Mr. Rickertsen was chief operating officer and a partner at Thayer Capital Partners ("Thayer"), a private equity investment firm. From September 1994 to January 1998, Mr. Rickertsen was a managing partner at Thayer. Mr. Rickertsen was a founding partner of three Thayer investment funds totaling over $1.4 billion and is a published author. Mr. Rickertsen served as a member of the boards of directors and audit committees of Apollo Senior Floating Rate Fund Inc. and Apollo Tactical Income Fund Inc., each of which is a closed-end management investment company, from 2011 and 2013, respectively, until 2023. From April 2012 to October 2016, Mr. Rickertsen was a member of the board of directors and compensation committee of Noranda Aluminum Holding Corporation, an integrated producer of value-added primary aluminum products and rolled aluminum coils. From April 2003 to January 2010, Mr. Rickertsen was a member of the board of directors and audit committee of Convera Corporation, a publicly-traded search-engine software company. From March 2004 to September 2008, Mr. Rickertsen was a member of the board of directors and compensation committee of UAP Holding Corp., a distributor of farm and agricultural products. Mr. Rickertsen received a B.S. from Stanford University and an M.B.A. from Harvard Business School.

**Qualifications**: We believe that Mr. Rickertsen is well-suited to serve on our Board due to his finance and capital markets experience across various industries and his experience as an outside director of several public companies, which provides the Board with important perspectives on corporate governance matters.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.    By reason of their positions as officers, directors, and/or fiduciaries of Strategy and because of their ability to control the business and corporate affairs of Strategy, the Individual Defendants owed Strategy and its shareholders fiduciary obligations of trust, loyalty, good faith,

14

and due care, and were and are required to use their utmost ability to control and manage Strategy in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Strategy and its shareholders so as to benefit all shareholders equally.

41.     Each director and officer of the Company owes to Strategy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Strategy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of Strategy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Strategy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a

majority of Strategy's Board at all relevant times.

45.      As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

46.      To discharge their duties, the officers and directors of Strategy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Strategy were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to Strategy's own Code of Conduct & Ethics (the "Code of Conduct");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Strategy conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Strategy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Strategy's operations would comply with all applicable laws and Strategy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

      47.    Each of the Individual Defendants further owed to Strategy and the shareholders the duty of loyalty requiring that each favor Strategy's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

17

48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Strategy and were at all times acting within the course and scope of such agency.

49.     Because of their advisory, executive, managerial, directorial, and controlling positions with Strategy, each of the Individual Defendants had access to adverse, non-public information about the Company.

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Strategy.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Strategy was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Strategy and was at all times acting within the course and scope of such agency.

## STRATEGY'S CODE OF CONDUCT

56.    Strategy's Code of Conduct states that the Company ". . . is committed to upholding the integrity of the Company through ethical business practices." The Code of Conduct defines "[e]thical conduct on the job . . . [as] simply a matter of dealing fairly and honestly with MicroStrategy, its employees, service providers, customers, suppliers, partners, competitors, investors, and the public." Further, the Code of Conduct states that it applies to any individual who is "an employee, officer, or member of the Board of Directors of MicroStrategy Incorporated and its majority-owned direct and indirect subsidiaries[,]" as well as any individual who is "a temp agency worker, independent contractor, or other individual engaged directly or indirectly by the Company who is not an employee."

19

57.    In a section titled "Ethical Standards," the Code of Conduct states the following:

You are expected to adhere to the following Company standards for activity in business-related locations or functions at all times.

• Engage in honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships

• Provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company

• Comply with applicable governmental laws, rules and regulations

• Provide prompt internal reporting of violations of the Code of Conduct to the appropriate person or persons indicated in this Code of Conduct and fully cooperate with Company investigations

• Maintain accountability for adherence to the Code of Conduct

• Treat customers, suppliers, and partners in a fair and honest manner

• Conduct the Company's business with integrity

• Maintain efficient, proper standards of work performance

• Maintain professional conduct during all Company business and events

• Adhere to all work-related written and verbal Company policies and instructions

• Maintain MicroStrategy business offices as clean and safe work environments

58.    In a section titled "Public Disclosures," the Code of Conduct states the following, in relevant part:

The following persons (collectively, the "Authorized Public Spokespersons") are the only persons who are authorized to communicate on behalf of the Company by any means (for example, press interviews, press releases, electronic chat rooms, electronic discussion boards, social media forums, news groups, or any other forums accessible by persons other than Company employees and persons authorized by the Company) to the general public, the media, market professionals (e.g. securities analysts, institutional investors, investment advisers, brokers, and

dealers), and securityholders:

> • Executive Chairman,
>
> • Chief Executive Officer,
>
> • President,
>
> • Chief Financial Officer,
>
> • General Counsel, and
>
> • their respective designees (but only in accordance with and to the extent provided by the applicable designation), including, but not limited to, the Chief Technology Officer and the Chief Marketing Officer.
>
> Authorized Public Spokespersons may make disclosures of material non-public information only pursuant to a confidentiality arrangement approved by the Legal Department or by such other means that, after consultation with the Legal Department, are believed to be in compliance with Regulation FD and other applicable laws and stock exchange rules.

59.     In a section titled "Securities, Inside Information," the Code of Conduct states the

following:

> Use of material non-public or "inside" information about MicroStrategy or other publicly traded entities, including MicroStrategy's customers, suppliers, and partners, for personal financial benefit by you or anyone else is strictly prohibited. You may not purchase or sell, directly or indirectly, securities while you possess material information not known to the public. Material information is generally considered to be information that an investor might consider important in deciding whether to buy, sell, or hold securities.
>
> Other than as expressly permitted by the section of this Code of Conduct entitled "Public Communications," you may not disclose material non-public information to anyone outside of the Company, including family members. Within the Company, you may disseminate material non-public information only to senior executives, members of the Board of Directors, and any other employees who need to know such information in connection with the performance of their Company duties.
>
> If you have a question as to whether certain information is material or whether it has been adequately disclosed to the public, you must contact the Legal Department and abstain from trading in the securities in question and disclosing the information to people outside the Company until you have been informed that the information

is not material or has been publicly disclosed and digested.  If you have reason to believe there has been an unintentional disclosure of material non-public information, contact the Legal Department immediately.

60.    In a section titled "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

> MicroStrategy expects you to avoid any direct or indirect interest, investment, or association that is likely to interfere with your ability to use independent judgment in performing your duties as a MicroStrategy employee or service provider, as the case may be.  A conflict of interest arises when you have a personal interest that influences or reasonably could be expected to influence your judgment or action in conducting the Company's business. This may put your objectivity in doubt when working with customers, suppliers, partners, competitors, or government officials. It is your responsibility to disclose any transaction, relationship, or other circumstance that constitutes a conflict of interest for you to the General Counsel, provided that if you are the General Counsel or an executive officer or director of MicroStrategy Incorporated, you should make such disclosure to the Audit Committee of the Board of Directors. Any such transaction, relationship, or circumstance fully disclosed to, and expressly approved by, the General Counsel or the Audit Committee, as applicable, shall be deemed not to violate this Code of Conduct.

> It is not possible to enumerate all situations that may present a conflict of interest. The facts of each case will determine whether there is a conflict. Such facts would include the amount of business involved, the extent to which you could influence the Company's decisions or the other party's decisions in the applicable matter, and the extent to which your objectivity, business judgment, or loyalty are affected, regardless of any actual or potential personal gain. For example, family relationships might influence your judgment either to your personal advantage or to the undue advantage of a relative. You must disclose to the General Counsel or the Audit Committee, as applicable, any circumstance in which you are aware that a relative has an interest in any Company transaction or has a material ownership interest in a customer, supplier, partner, or competitor, to the extent that such circumstance constitutes a conflict of interest for you. Generally, a material ownership interest will involve ownership of at least 5% of a company, although any ownership level coupled with other circumstances could constitute a conflict of interest for you if it would influence your objectivity, business judgment or loyalty.

61.    In a section titled "Corporate Opportunity," the Code of Conduct states the

following:

> Employees must not appropriate, or divert to any other person or entity, a business

or financial opportunity which the employee learns of or develops in the course of employment and which the employee knows, or reasonably could anticipate, the Company would have an interest in pursuing.

62.      In a section titled "Recording and Reporting Information," the Code of Conduct

states the following:

Under no circumstances may you report or record information that you know or suspect is false. It is a violation of Company policy to make false statements or to conceal a material fact in any communication to the Company, including financial records, expense reports, employment or employee benefit applications, statements made in connection with investigations or litigation, and any governmental reports.

False reporting of information to people and organizations outside the Company, including customers, is strictly prohibited.  For example, this prohibition applies to reports to auditors or investors, documents submitted to or maintained for government agencies, or documents containing product quality or pricing information. This prohibition is also critical in situations where the Company is selling goods to the government or to a customer that is selling goods to the government.

63.      In a section titled "Safeguarding MicroStrategy's Assets," the Code of Conduct

states the following:

MicroStrategy has substantial assets.  Company assets include not only funds, facilities, equipment, and inventory, but also intellectual property (such as patents, copyrights, and trademarks), trade secrets, and confidential data (such as customer, supplier, partner, financial, and pricing information). Our competitive success depends on your efforts to safeguard Company assets.  We must maintain an adequate system of internal controls to help ensure that assets are safeguarded, transactions are executed in accordance with management's authorization, financial records are accurate and properly recorded, expense reports are proper and well documented, and violations of the Code of Conduct are detected and corrected.

64.      In a section titled "Use of MicroStrategy Assets," the Code of Conduct states the

following:

MicroStrategy's time, equipment, systems, facilities, supplies, and other assets exist for the purpose of conducting MicroStrategy business. Although the Company conducts routine audits to help ensure that Company systems, networks, and databases are used appropriately, it is your personal responsibility to take reasonable steps to ensure that your use of Company assets, and any authorization that you give others to use Company assets, are both authorized and proper.

65.     In violation of the Code of Conduct, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## STRATEGY'S AUDIT COMMITTEE CHARTER

66.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following, in relevant part:

> The purpose of the Audit Committee of the Board of Directors (the "Board") of MicroStrategy Incorporated (the "Company"), is to review the accounting and financial reporting process of the Company, the audits, both internal and external, of its financial statements, and the effectiveness of the Company's controls over financial reporting. The Audit Committee will make such examinations as are necessary to monitor the accounting and financial reporting and the internal and external audits of the Company and its subsidiaries, to provide to the Board the results of its examinations and recommendations derived therefrom, to outline to the Board improvements made, or to be made, in internal accounting controls, to nominate an independent registered public accounting firm (hereinafter, the "independent auditor"), and to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require Board attention.

67.     Regarding the Audit Committee's duties with respect to oversight of the independent auditor, the Audit Committee Charter states the following:

> 7. The independent auditor shall report directly to the Audit Committee, and the Audit Committee shall have sole and direct responsibility for overseeing the independent auditor, including resolution of disagreements between Company management and the independent auditor regarding financial reporting. In connection with its oversight role, the Audit Committee shall, from time to time as appropriate, receive and consider the reports and other communications required to be made by the independent auditor regarding:

A. critical accounting policies and practices;

B. alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with Company management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

C. other material written communications between the independent auditor and Company management; and

D. any other matters addressed in the applicable auditing standards of the PCAOB (the "PCAOB Auditing Standards").

68.    Regarding the quality of the Company's accounting principles, the Audit Committee Charter states the following:

The Audit Committee shall discuss with the independent auditor the independent auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied to its financial reporting. The discussion shall include such issues as the clarity of the Company's financial disclosures and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates and other significant decisions made by management in preparing the financial disclosure.

69.    Regarding the Audit Committee's duties with respect to audited financial statements, the Audit Committee Charter states the following:

9. The Audit Committee shall review and discuss with the Company's management the Company's audited financial statements.

10. The Audit Committee shall discuss with the independent auditor the Company's audited financial statements and the matters required to be discussed by the PCAOB Auditing Standards.

70.    With respect to the Audit Committee's oversight responsibilities, the Audit Committee Charter states the following, in relevant part:

16. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. The Audit Committee shall receive and review the certifications of the Company's Chief Executive Officer ("CEO") and CFO required by Rule 13a-14 under the Exchange Act.

17. The Audit Committee shall coordinate the Board's oversight of risk assessment and management, including data privacy and cybersecurity. Such oversight includes reviewing and discussing with management guidelines and policies to govern the process by which the Company's exposure to risk is handled and the potential impact of risk exposures on the Company's business, financial results, and operations.

71.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

72.    Strategy functions as a Bitcoin Treasury Company and as such chiefly provides various forms of securities to consumers and investors. In addition, Strategy continually grows its bitcoin reserves through portions of the Company's proceeds, with no set goal or amount of bitcoin to achieve. Between 2023 to February 14, 2025, the Company acquired roughly 346,240 bitcoins for a total cost of approximately $27 billion and did not dispose of any bitcoins during that same period.

73.    On January 1, 2025, the Company adopted the FASB's ASU 2023-08. ASU 2023-08 instituted a new manner of accounting known as a "fair value" accounting methodology. The

fair value accounting methodology requires publicly traded companies to assess their cryptocurrency ("crypto") assets at the assets' current fair market value price.

74.    As such, publicly traded companies who adhere to ASU 2023-08 must report the gains and losses from fluctuations in the fair market value of their crypto assets recognized in net income in each reporting period. The stated purpose for ASU 2023-08 is to provide a better accounting method for crypto assets and to better capture the fair market value of such assets.

75.    In contrast to the more recent accounting method set forth in ASU 2023-08, the cost-less-impairment accounting methodology applies a more traditional understanding to crypto assets. The cost-less-impairment accounting methodology treats crypto assets as intangible assets, and as such only requires recognition of impairments in the event of a price depreciation.[3]

76.    Further, under the cost-less-impairment accounting methodology, a company is not required to mark up for price increases unless the crypto assets are actually sold. Prior to Strategy's adoption of ASU 2023-08, the Company utilized the cost-less-impairment accounting methodology when accounting for its bitcoin holdings.

## **FALSE AND MISLEADING STATEMENTS**

### *April 30, 2024 Press Release and Earnings Call*

77.    The Relevant Period began on April 29, 2024, during after-market hours, when the Company issued a press release regarding its financial results for the first quarter of 2024 (the "1Q24 Press Release"). The 1Q24 Press Release stated, *inter alia*, that "[a]s of March 31, 2024, the carrying value of the Company's digital assets (comprised of approximately 214,278 bitcoins) was $5.074 billion, which reflects cumulative impairment losses of $2.461 billion since

---

[3] With regard to the field of accounting, an impairment occurs when the value of a company's assets has fallen below the book value of the asset.

acquisition[.]" Nevertheless, the 1Q24 Press Release quoted Defendant Kang's reassurances to investors, stating, in relevant part:

> We acquired 25,250 additional bitcoins since the end of the fourth quarter, our 14th consecutive quarter of adding more bitcoin to our balance sheet. We believe that the combination of our operating structure, bitcoin strategy, and focus on technology innovation provides a unique opportunity for value creation for our shareholders. Year to date, the price of bitcoin appreciated significantly, spurred notably by the approval of the spot bitcoin exchange traded products which has increased institutional demand and resulted in further regulatory clarity[.]

78.     Also on April 29, 2024, during after-market hours, Defendants hosted an earnings call with investors to discuss the Company's financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Saylor touted the supposed benefits of Strategy's bitcoin-driven investment strategy and operations and represented that bitcoin's volatility served as a significant factor in the Company's growth. Defendant Saylor stated, *inter alia*:

> Now MicroStrategy, if it had just simply adopted Bitcoin purely, perhaps it would have had the same performance as Bitcoin. But how do we actually outperform Bitcoin? ***I think the key here is volatility is a benefit to us. And so we have harnessed volatility***, and we've also harnessed our unique ability to issue securities such as convertible bonds. And the fact that we embrace the securitization of Bitcoin and we embrace the volatility of the asset class has given us the ability to raise capital, right?
>
> * * *
>
> Bitcoin has digital property is a store of value, ***but it's the emergent high performance, high volatility, high functionality, high utility store of value, and it's global. So we actually think that it's going to continue to grow from here.*** [4]

79.     Also during the 1Q24 Earnings Call, Defendant Kang stated that the Company's "management team has demonstrated a strong track record of disciplined approach to navigate through volatile times in the Bitcoin market," and "that the combination of our operating structure,

---

[4] Unless otherwise indicated, all emphasis is added.

Bitcoin strategy, and focus on technology innovation provides a unique value proposition for shareholder value creation, when compared to other forms of exposure to Bitcoin."

*May 1, 2024 10-Q*

80.    On May 1, 2024, the Company filed its quarterly report on Form 10-Q with the SEC, reporting its financial results for the period ending March 31, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q reported that the Company "expects the adoption of ASU 2023-08 will have a material impact on its consolidated balance sheets, statements of operations, statements of cash flows and disclosures" and stated that "[i]f the Company were to adopt [ASU 2023-08] during 2024, it estimates that its 2024 beginning retained earnings balance would increase by approximately $3.1 billion." Notably, the 1Q24 10-Q did not explain in detail the extent of such impact.

81.    Rather, the 1Q24 10-Q purported to warn that "[c]hanges in the accounting treatment of [Strategy's] bitcoin holdings **could** have significant accounting impacts, including increasing the volatility of our results[.]" It stated, in  relevant part, that:

> Due in particular to the volatility in the price of bitcoin, we expect the adoption of ASU 2023-08 will likely have a material impact on our financial results in future periods, increase the volatility of our financial results, and affect the carrying value of our bitcoin on our balance sheet, and **could** have adverse tax consequences, which in turn **could** have a material adverse effect on our financial results and the market price of our class A common stock. Additionally, as a result of ASU 2023-08 requiring a cumulative-effect adjustment to our opening balance of retained earnings as of the beginning of the annual period in which we adopt the guidance and not permitting retrospective restatement of our historical financial statements, our future results will not be comparable to results from periods prior to our adoption of the guidance.

The 1Q24 10-Q's risk warning with regard to the adoption of ASU 2023-08 and the volatility of the bitcoin market was too speculative and generic to accurately capture Defendants' actual understanding of the risks posed to the Company. Moreover, Defendants continued to minimize the risks stated above by conveying the supposed benefits of bitcoin's volatility.

82.    Additionally, the 1Q24 10-Q was accompanied by signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Kang and Le. The 1Q24 10-Q's signed SOX certifications stated that the 1Q24 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

### *August 1, 2024 Press Release and Earnings Call*

83.    On August 1, 2024, the Company issued a press release regarding its financial results for the second quarter of 2024 (the "2Q24 Press Release"). Among other things, the 2Q24 Press Release stated that "[a]s of June 30, 2024, the carrying value of the Company's digital assets (comprised of approximately 226,331 bitcoins) was $5.688 billion, which reflects cumulative impairment losses of $2.641 billion since acquisition[.]" Despite the losses reported above, the 2Q24 Press Release quoted Defendant Le as boasting of "yet another successful quarter for our bitcoin strategy." Defendant Le went on to state, in relevant part:

> MicroStrategy today holds 226,500 bitcoins reflecting a current market value 70% higher than our cost basis. We remain laser focused on our Bitcoin development strategy and intend to continue to achieve positive "BTC Yield,"  which is a new KPI that we are introducing, targeting 4-8% annually, over each of the next three years.

84.    The 2Q24 Press Release also quoted Defendant Kang who stated, in relevant part:

> Since the beginning of [the quarter], we grew our bitcoin holdings by adding 12,222 bitcoins through proceeds from our capital markets activities and excess cash . . . . Through our use of intelligent leverage, we have again achieved a "BTC Yield" of 12.2% year-to-date, which we believe demonstrates significant bitcoin accretion to shareholders[.]

85.    Also on August 1, 2024, the Company hosted an earnings call to discuss with investors its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Kang conveyed to investors that subsequent to the adoption of ASU 2023-08, "which requires fair value treatment for bitcoin holdings by Q1 of next year when the rule takes effect, . . . we will realize the benefit of the significant difference between the market value and the carrying value of our balance sheet."

86.    Moreover, during the 2Q24 Earnings Call, Defendant Kang stated that the Company possessed a "strong track record of applying a disciplined approach to navigate through volatile times in the bitcoin market[.]" Defendant Kang further conveyed to investors "that the combination of our operating structure, bitcoin strategy, and focus on technology innovation provides a unique value proposition for shareholders when compared to other forms of bitcoin exposure."

### August 6, 2024 10-Q

87.    On August 6, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2024 (the "2Q24 10-Q"), reporting its financial results for the second quarter of 2024. The 2Q24 10-Q represented the same statements represented in ¶¶80-81, *supra*, concerning the Company's adoption of ASU 2023-08 and the risks to the Company posed by ASU 2023-08's adoption as well as the volatility of the bitcoin market.

88.    Additionally, the 2Q24 10-Q was accompanied by SOX certifications signed by Defendants Kang and Le, which were substantively the same as the SOX certifications referenced in ¶82, attesting to the accuracy of the 2Q24 10-Q.

### October 30, 2024 Press Release and Earnings Call

89.    On October 30, 2024, the Company issued a press release concerning its financial results for the third quarter of 2024 (the "3Q24 Press Release"). The 3Q24 Press Release quoted Defendant Le as stating, in relevant part:

> Our focus remains to increase value generated to our shareholders by leveraging the digital transformation of capital. Today, we are announcing a strategic goal of raising $42 billion of capital over the next 3 years, comprised of $21 billion of equity and $21 billion of fixed income securities, which we refer to as our "21/21 Plan." As a Bitcoin Treasury Company, we plan to use the additional capital to buy more bitcoin as a treasury reserve asset in a manner that will allow us to achieve higher BTC Yield[.]

90.    Additionally, the 3Q24 Press Release quoted Defendant Kang who boasted of the Company's supposed "proven track record of using intelligent leverage" which "serves as the foundation to execute on our strategic three-year 21/21 Plan[,]" and that "[t]hrough our treasury strategy, we increased our bitcoin holdings by 11% in the quarter, increased our year-to-date BTC Yield to 17.8%, and reduced our total annualized interest expense by $24 million[.]"

91.    Also on October 30, 2024, the Company hosted an earnings call to discuss with investors its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Saylor expressed confidence in "the strength of our overall [bitcoin] treasury strategy, and the strength of the Bitcoin market[.]" Defendant Saylor further conveyed the purported benefits of the Company's bitcoin-driven strategy, referring to bitcoin both as "incredible" and "the strongest asset." Defendant Saylor went on to denote bitcoin as a general remedy for corporate issues and praise the supposed benefits of the asset's volatility, stating, *inter alia*:

> MicroStrategy threw its lot in with bitcoin, but I'm happy to say here today that not only has MicroStrategy managed to become 100% bitcoin, we've managed to almost 2x the performance of bitcoin. And we've done it through taking advantage of our unique opportunities and our unique capabilities as an operating company to assume intelligent leverage, ***to sell volatility and to manage our balance sheet***. So this is just a -- it's a great outcome.

* * *

With the embrace of BTC yield and BCT yield shows that in fact we acquired the capital in a manner that was accretive to our shareholders as opposed to dilutive. And that means that when we're actually engaging in capital markets activity, we're doing it in an accretive high velocity fashion. That, of course, is what is driving this trading volume, what's driving this open interest. And of course, *because we have the volatility, many of the things we do are actually selling the volatility, recycling the proceeds of the volatility back into bitcoin and then delivering that to our shareholders in the form of a BTC yield.*

* * *

*Our belief - is that Bitcoin is a solution to the problem that 95% of public companies have, and I guess 99% of private companies have, which is they don't have healthy balance sheets. Bitcoin fixes the balance sheet. It'll bring your stock back to life. It'll bring your options back to life. It'll bring volatility.*

92.    Also during the 3Q24 Earnings Call, Defendant Kang touted the Company's purported "track record of using equity, debt, and excess cash to acquire Bitcoin, as part of our treasury operations[, which] has resulted in value creation for our shareholders[,]" as well as the Company's "strong track record" of supposedly "applying a disciplined approach to navigate through hostile times in the Bitcoin market."

### October 31, 2024 10-Q

93.    On October 31, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2024 (the "3Q24 10-Q"), reporting its financial results for the third quarter of 2024. The 3Q24 10-Q represented the same statements referenced in ¶¶80-81, *supra*, concerning the Company's adoption of ASU 2023-08 and the risks to the Company posed by ASU 2023-08's adoption as well as the volatility of the bitcoin market.

94.    Additionally, the 3Q24 10-Q was accompanied by SOX certifications signed by Defendants Kang and Le, which were substantively the same as the SOX certifications referenced in ¶82, attesting to the accuracy of the 3Q24 10-Q.

### February 5, 2025 Press Release and Earnings Report

95.     On February 5, 2025, the Company issued a press release concerning its financial results for the fourth quarter and full year of 2024 (the "Q4/FY24 Press Release"). The Q4/FY24 Press Release reported that the Company attained a "74.3% 'BTC Yield' KPI . . . in FY [fiscal year] 2024 and 2.9% in QTD [quarter-to-date] 2025[,]" as well as "[r]evise[d its] annual BTC Yield target to a minimum of 15% for 2025[.]"

96.     The Q4/FY24 Press Release quoted Defendant Le as stating, in relevant part, that "[l]ooking ahead to the rest of 2025, we are well-positioned to further enhance shareholder value by leveraging the strong support from institutional and retail investors for our strategic plan"— i.e., bitcoin investment strategy.

97.     The Q4/FY24 Press Release also quoted Defendant Kang as stating, in relevant part, that "2025 will take our evolution further with the introduction of the BTC $ Gain KPI and when we adopt fair value accounting [*i.e.,* ASU 2023-08] for our bitcoin holdings with our Q1 results, transforming our financial results and bringing more transparency to the value generation and profitability of our treasury operations[.]"

98.     Moreover, the Q4/FY24 Press Release utilized its "BTC Gain" and "BTC $ Gain" KPIs to represent the Company's full year financial results for 2024 and its expectations for 2025, and to further underline Defendants' supposed confidence in the Company's bitcoin-driven strategy and operations. Notably, the 4Q/FY24 Press Release observed that, "[f]or the full year 2024, the Company's BTC Gain was 140,538" and that "[t]he Company's 2025 target is achievement of an annual BTC $ Gain of $10 billion."

99.     Also on February 5, 2025, the Company hosted an earnings call with investors to discuss its financial results for the fourth quarter and full year of 2024 (the "4Q/FY24 Earnings Call"). During the 4Q/FY24 Earnings Call, Defendant Saylor boasted of bitcoin, describing it as

"a very, very compelling investment idea" and touting that the asset's volatility was a significant

factor in driving the Company's financial performance, stating, *inter alia*:

> ***[T]he secret, of course . . . isn't just performance, it's also the volatility.*** Volatility is a measure of energy. And as you can see, Strategy is the most volatile stock out of the S&P 500 universe. So we don't hide from it. We're quite proud of it. We engineer the business in order to stay volatile. Conventional wisdom is to strip volatility from a publicly traded company, strip it from the balance sheet, strip it from the P&L.
>
> MicroStrategy has embraced volatility, and not only do we pursue it with Bitcoin, but we pursue it with our leverage strategies to actually get a volatility that's greater than the native Bitcoin volatility. ***There's a result of that volatility and the result is liquidity and optionality.***

100.    Later during the 4Q/FY24 Earnings Call, Defendant King discussed the Company's

adoption of ASU 2023-08 and the Company's supposed financial success throughout the year 2025

stating, in relevant part:

> [D]igital asset impairment charges in Q4 were approximately $1 billion and approximately $1.8 billion for the full year. I am happy to announce that Q4 will be the last quarter where we will recognize an impairment charge on our Bitcoin Holdings as we move to fair-value accounting in Q1.
>
> \* \* \*
>
> We can't predict the price of Bitcoin, nor can we predict broader equity and debt capital market conditions. ***However, we are confident that our Bitcoin Treasury Strategy will continue to generate value and are revising our targets for 2025 to achieve a minimum of 15% BTC Yield and a $10 billion BTC dollar gain for 2025.***

***February 18, 2025 10-K***

101.    On February 18, 2025, the Company filed its Annual Report on Form 10-K with

the SEC, reporting its financial results for the quarter and year ended December 31, 2024 (the

"2024 10-K"). The 2024 10-K was signed by Defendants Saylor, Kang, Le, Graham, Patten,

Rechan, and Rickertsen. The 2024 10-K represented substantively the same statements referenced

in ¶¶80-81, *supra*, concerning the Company's adoption of ASU 2023-08 and the risks to the

Company posed by ASU 2023-08's adoption as well as the volatility of the bitcoin market. Additionally, the 2024 10-K observed that the Company "estimates the adoption of ASU 2023-08 will increase its 2025 beginning retained earnings balance by approximately $12.745 billion, which reflects a $17.880 billion increase in digital assets[.]"

102.    Additionally, the 2024 10-K was accompanied by SOX certifications signed by Defendants Kang and Le, which were substantively the same as the SOX certifications referenced in ¶82.

103.    The statements referenced and identified in ¶¶77-102 above were materially false and misleading and failed to disclose, *inter alia,* that: (1) the adoption of the Financial Accounting Board's Accounting Standards Update No. 2023-08 was riskier and more impactful to the Company's finances than Defendants had continuously represented to investors; (2) the risks associated with bitcoin's volatility were greater than represented; and (3) as a result of the foregoing, the Company's profitability when applying its bitcoin-driven investment strategy and treasury options was substantially less than it had previously represented. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

104.    The truth fully emerged on April 7, 2025, during pre-market hours, when Strategy filed a current report on Form 8-K with the SEC (the "Unrealized Loss 8-K"), revealing that the Company had recognized a ***$5.91 billion*** unrealized loss on its digital assets in the first quarter of 2025 following its adoption of ASU 2023-08.

105.    More specifically, the Unrealized Loss 8-K stated, in relevant part:

We have generated net losses in recent periods, primarily due to digital asset impairment losses. As of January 1, 2025, we have adopted ASU 2023-08, pursuant

to which we are required to recognize increases or decreases in fair value of our digital assets as incurred in our Consolidated Statements of Operations. Our Case unrealized loss on digital assets for the quarter ended March 31, 2025 was $5.91 billion, which we expect will result in a net loss for the quarter ended March 31, 2025. We may not be able to regain profitability in future periods, particularly if we incur significant unrealized losses related to our digital assets. As a result, our results of operations and financial condition may be materially adversely affected.

106.    On this news, the price of the Company's stock fell $25.47 per share, or 8.67%, from a closing price of $293.61 per share on April 4, 2025 to close at $268.14 per share on April 7, 2025.

## SUBSEQUENT DEVELOPMENTS

107.    On May 1, 2025, the Company issued a press release concerning its financial results for the first quarter of 2025 (the "1Q25 Press Release"). The 1Q25 Press Release reported an unrealized value loss on digital assets of roughly $5.9 billion during first quarter of 2025.

108.    During a subsequent earnings call to discuss the results stated in the 1Q25 Press Release (the "1Q25 Earnings Call"), Defendant Kang cited the reason for the loss stated above as the Company's decision to apply a fair value accounting methodology to the Company's bitcoin assets in light of the asset's rapid depreciation in the first quarter of 2025. More specifically, Defendant Kang stated:

> One fundamental difference now under fair value accounting is that our holdings are marked on the last day of every quarter, not throughout the quarter as before. Any new Bitcoin purchased during the quarter were initially held at the purchase price of those Bitcoins and our prior quarter and new quarter purchases are fair valued as of the last day of each quarter. In Q1, the price of Bitcoin declined from approximately $93,400 at the end of the year to roughly $82,400 at the end of Q1, resulting in a $4.9 billion unrealized fair value loss on our pre-Q1 holdings.
>
> We also purchased throughout the course of Q1, an additional 80,715 bitcoin at an average price of approximately $94,900, representing $7.7 billion of new purchases. On the last day of Q1 because the market price of bitcoin was approximately $83,400, these new purchases also reflected a fair value decline of about $1 billion. As a result, our overall Q1 unrealized fair market value loss was $5.9 billion, which flowed directly through our income statement.

## DAMAGES TO STRATEGY

109.    As a direct and proximate result of the Individual Defendants' conduct, Strategy will lose and expend many millions of dollars.

110.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

111.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

112.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

113.    Additionally, these expenditures include, but are not limited to, unjust compensation and benefits provided to the Individual Defendants who breached their fiduciary duties to the Company, as well as proceeds obtained through improper lucrative insider trading conducted by four of the Individual Defendants.

114.    As a direct and proximate result of the Individual Defendants' conduct, Strategy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

115.    Plaintiff brings this action derivatively and for the benefit of Strategy to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Strategy, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

116.    Strategy is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiff is, and has been at all relevant times, a shareholder of Strategy. Plaintiff will adequately and fairly represent the interests of Strategy in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

119.    A pre-suit demand on the Board of Strategy is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Saylor, Le, Graham, Patten, and Rickertsen (the "Director-Defendants") and non-parties Brian P. Brooks, Jane A. Dietze, and Gregg J. Winiarski (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

120.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

121.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Strategy to issue false and misleading statements which were intended to make Strategy appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

122.    Additional reasons that demand on Defendant Saylor is futile follow. Defendant Saylor is the Company's founder and has served as Chairman of the Board and Executive Chairman since August 2022 and previously served as Chairman of the Board and CEO from November 1989, when he founded Strategy, to August 2022. He also previously served as President from November 1989 to November 2000, from January 2005 to October 2012, and from January 2016 to July 2020. Defendant Saylor also serves as the Chair of the Investments Committee. In addition, the Company provides Defendant Saylor with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Saylor also personally made several of the false and

misleading statements alleged herein. In addition, he signed the false and misleading 2024 10-K. Moreover, Defendant Saylor is named as a defendant in the Securities Class Action. For these reasons, Defendant Saylor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Le is futile follow. Defendant Le has served as a Company director and as President and CEO since August 2022 and previously served as President from May 2022 to August 2022, President & CFO from July 2020 to May 2022, Senior Executive Vice President, Chief Operating Officer & CFO from April 2020 to July 2020, Senior Executive Vice President & Chief Operating Officer from November 2019 to April 2020, Senior Executive Vice President, Chief Operating Officer, CFO & Treasurer from June 2018 to November 2019, and Senior Executive Vice President, CFO & Treasurer from August 2015 to June 2018. In addition, the Company provides Defendant Le with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Le also personally made several of the false and misleading statements alleged herein. In addition, he signed the false and misleading 2024 10-K, as well as SOX certifications for the Company's quarterly and full year SEC filings for 2024. Moreover, Defendant Le is named as a defendant in the Securities Class Action. For these reasons, Defendant Le breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Graham is futile follow. Defendant Graham has served as a Company director since April 2014. He also serves as the Chair of the Audit Committee and as a member of the Investments Committee. Defendant Graham has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2024 10-K. For these reasons, Defendant Graham breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Patten is futile follow. Defendant Patten has served as a Company director since November 2004. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Patten has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2024 10-K. For these reasons, Defendant Patten breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant Rickertsen is futile follow. Defendant Rickertsen has served as a Company director since October 2002. He also serves as Chair of the Compensation Committee and as a member of the Nominating Committee. Further,

Defendant Rickertsen served as a member of the Audit Committee during the Relevant Period. Defendant Rickertsen has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, he signed the false and misleading 2024 10-K. For these reasons, Defendant Rickertsen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on the Board is futile follow.

128.    Defendants Graham, Patten, and Rickertsen (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

129.    In violation of the Code of Conduct, the Director-Defendants engaged in or

permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

130.    Strategy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Strategy any part of the damages Strategy suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

131.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

132.    The acts complained of herein constitute violations of fiduciary duties owed by

Strategy's officers and directors, and these acts are incapable of ratification.

133.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Strategy. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Strategy, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

134.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Strategy to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

135.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### <u>FIRST CLAIM</u>
**Against the Individual Defendants for Breach of Fiduciary Duties**

136.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Strategy's business and affairs.

138.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Strategy.

140.    In breach of their fiduciary duties owed to Strategy, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the adoption of the Financial Accounting Board's Accounting Standards Update No. 2023-08 was riskier and more impactful to the Company's finances than represented; (2) the risks associated with bitcoin's volatility were greater than represented; and (3) as a result the Company's profitability when applying its bitcoin-driven investment strategy and treasury options were substantially less profitable than represented. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

141.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

142.    Also, in breach of their fiduciary duties, the Individual Defendants failed to

maintain adequate internal controls.

143.    In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales while the Company's stock price was artificially inflated before the fraud was exposed, netting total proceeds of approximately $31,460,747.

144.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Strategy's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

145.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Strategy has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of Strategy, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Unjust Enrichment**

148.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

149.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Strategy.

150.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Strategy that was tied to the performance or artificially inflated valuation of Strategy or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

151.     Plaintiff, as a shareholder and a representative of Strategy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

152.     Plaintiff, on behalf of Strategy, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

153.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Strategy, for which they are legally responsible.

155.     As a direct and proximate result of the Individual Defendants' abuse of control, Strategy has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Strategy has sustained and continues to sustain significant damages. As a result of the misconduct alleged

herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Strategy, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Strategy in a manner consistent with the operations of a publicly held corporation.

159.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Strategy has sustained and will continue to sustain significant damages.

160.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf of Strategy, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

164.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Strategy to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

165.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

166.    Plaintiff, on behalf of Strategy, has no adequate remedy at law.

### SIXTH CLAIM
**Against Defendants Saylor, Kang, and Le for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    Strategy and Defendants Saylor, Kang, and Le are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Saylor's, Kang's, and Le's willful and/or reckless violations of their obligations as officers and/or directors of Strategy.

169.    Defendants Saylor, Kang, and Le, because of their positions of control and authority as officers and/or directors of Strategy, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Strategy, including the wrongful acts complained of herein and in the Securities Class Action.

170.    Accordingly, Defendants Saylor, Kang, and Le are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising

out of violations of the Exchange Act.

171. As such, Strategy is entitled to receive all appropriate contribution or indemnification from Defendants Saylor, Kang, and Le.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Strategy, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Strategy;

(c)    Determining and awarding to Strategy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Strategy and the Individual Defendants to take all necessary actions to reform and improve Strategy's corporate governance and internal procedures to comply with applicable laws and to protect Strategy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Strategy to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

(e)    Awarding Strategy restitution from the Individual Defendants, and each of

them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 19, 2025

Respectfully submitted,

**SPIRO & BROWNE, PLC**

  */s/ David G. Browne*
David G. Browne (VSB No. 65306)
Spiro & Browne PLC
2400 Old Brick Road
Glen Allen, VA 23060
Telephone: (804) 573-9220
Email: dbrowne@sblawva.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net